## STRINGFELLOW *v.* CAIN.

1. Under the act entitled "An Act concerning the practice in territorial courts, and appeals therefrom," approved April 7, 1874 (18 Stat. pt. 3, p. 27), the appellate jurisdiction of this court over the judgment or the decree rendered by a territorial court in a case not tried by a jury can only be exercised by appeal.

2. Where the record of a suit is duly certified upon an appeal to a district court in Utah, and the latter states its findings of fact and its conclusions of law separately, and appeals from its order refusing a new trial and from its judgment are taken to the Supreme Court of that Territory, the statute whereof requires a statement, to be settled by the judge who heard the cause, specifically setting forth the "particular errors or grounds" relied on, and containing "so much of the evidence as may be necessary to explain them, and no more;" and where a statement settled and signed by him, and annexed to the copy of the order refusing a new trial, contains all the testimony and written proofs and allegations of the parties certified up to the District Court, upon which the trial was had, and it was stipulated that the statement might be used on an appeal from the judgment to the said Supreme Court, — *Held*, 1. That the proceeding was thus made to conform to the requirements of the Practice Act of Utah, and that the latter court was called upon to decide whether the evidence was sufficient to sustain the findings of fact, and, if it was, whether they would support the judgment. 2. That if that court reverses the judgment because the evidence does not sustain the findings, other findings must be made before the case can be put in a condition for hearing here ; but if it has all the evidence which could be considered below, should the case be remanded, it may state the facts established by the evidence and render judgment. On an appeal to this court, the case, if otherwise properly here, will be determined upon the facts so stated. 3. That if the findings of the District Court be sustained, and its judgment affirmed, or if its judgment be reversed for the reason that the findings are not sufficient to support the judgment, such findings are, in effect, adopted by the said Supreme Court, and they, for the purpose of an appeal here, furnish a sufficient statement of the facts of the case, within the meaning of the act "concerning the practice in territorial courts and appeals therefrom," approved April 7, 1874. *Supra.*

3. A., possessed of a lot in the city of Salt Lake, Utah, died in 1857, leaving a widow and minor children. Under the act of March 2, 1867 (14 Stat. 541), the mayor, Nov. 4, 1871, duly entered at the proper land-office the lands occupied as the site of the city, and received, June 1, 1872, a patent therefor, " in trust for the several use and benefit of the occupants thereof according to their respective interests." The legislature of the Territory prescribed, by a statute approved Feb. 17, 1869, rules and regulations for the execution of such trusts, and provided that the several lots and parcels within the limits of the lands so entered should be conveyed to " the rightful owner of possession, occupant, or occupants," or to such persons as might be entitled to the occupancy or possession. Shortly after A.'s death his widow relinquished the possession of a part of the lot. She subsequently conveyed another portion thereof, and removed with her children therefrom. Another portion was sold by the administrator of A., to pay taxes assessed and debts incurred by making improvements upon the property after the latter's death. The purchaser paid full value therefor, and has since Dec. 10, 1869, remained in the exclusive possession thereof. *Held,* 1. That A. at the time of his death had, by reason of his possession of the lot, an inchoate right to the benefit of the act of Congress, should under its provisions the lands be entered, and that his right to maintain the possession as against the other inhabitants of the city descended under the laws of Utah to his widow and children. 2. That the withdrawal of the widow and children from parts of the lot, and her voluntary surrender of all control over them, extinguished her and their rights as to such parts. 3. That, under the territorial statute, an occupant of a lot could sell and convey his possessory rights therein, before the lands were so entered. 4. That the purchaser from the administrator is entitled to a conveyance from the mayor. 5. That the widow and children of A. are entitled to a deed from the mayor conveying to them, according to their respective interests, that part of the lot whereof they were in possession at the time the lands were entered.

ERROR to and appeal from the Supreme Court of the Terri· tory of Utah.

The facts are stated in the opinion of the court.

*Mr. George W. Biddle* and *Mr. J. L. Rawlins* for Stringfellow.

*Mr. Robert N. Baskin, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

By the act of Congress " concerning the practice in territorial courts and appeals therefrom," approved April 7, 1874 (18 Stat. pt. 3, p. 27), the appellate jurisdiction of this court over the judgments and decrees of the territorial courts in cases of trial by jury is to be exercised by a writ of error, and in all

other cases by appeal. It follows that the appeal in this case was properly taken, and that the writ of error must be dismissed.

An important question arising under that part of the Civil Practice Act of Utah which relates to appeals in a civil action from the District Court to the Supreme Court of the Territory has been elaborately discussed in the argument, but in the view we take of the case it need not be decided. This is a special statutory proceeding, instituted in a Probate Court to settle disputes between claimants as to their respective rights under the trust created through the purchase, by the mayor of Salt Lake City, of the lands on which the city stands, pursuant to the authority for that purpose granted by the act of March 2, 1867 (14 Stat. 541), "for the relief of the inhabitants of cities and towns upon the public lands," and the several acts amendatory thereof. The territorial statute under which this trust is to be carried into execution (Comp. Laws Utah, 1876, 379) requires parties interested to sign a statement in writing containing the particulars of their claim, and deliver it to the clerk of the Probate Court of the county. If there are conflicting claimants, it is made the duty of the probate judge to call them before him, " and proceed to hear the proof adduced and the allegations of the parties, and decide according to the justice of the case." The statements filed stand in the place of pleadings. The court is required to cause full minutes of the testimony to be kept, which must be preserved with the papers, and entered on the record with the decision at length. If either party is aggrieved by the decision, he may appeal to the District Court, as in other cases, and upon the perfection of an appeal the Probate Court must " cause the testimony and written proofs adduced, together with the statements of the parties and the judgment of the court, to be certified to the District Court, to be there tried anew, without pleadings, except as above provided."

This case was heard in the District Court on the record certified up in accordance with these requirements, and in giving its decision the court stated its findings of fact and conclusions of law separately. In this it followed the rule prescribed by the Civil Practice Act of Utah, on a trial by the court of an

issue of fact in a civil action. After the decision had been made, the present appellees moved for a new trial, on the ground that the evidence was not sufficient to support the findings. This motion was denied, and appeals were thereupon taken to the territorial Supreme Court, both from the judgment and the order refusing a new trial. Such appeals are allowed by the Practice Act. When an appeal is taken to the Supreme Court of the Territory, the law requires a statement to be settled and signed by the judge who heard the cause, which shall set forth " specifically the particular errors or grounds " relied on, " and contain so much of the evidence as may be necessary to explain the particular errors or grounds specified, and no more." This statement is annexed to the copy of the judgment roll or order appealed from and furnished to the Supreme Court. Comp. Laws Utah, 1876, 493, 494.

The statement settled and signed in this case, annexed to the copy of the order refusing a new trial appealed from, contained all the " testimony, written proofs, and statements of the parties " certified up from the Probate Court, and upon which the trial was had; and it was stipulated that the statement on the appeal from this order might be used, so far as applicable, on the appeal from the judgment. Thus, the proceeding was made to conform to the regulations of the Practice Act in reference to appeals in civil actions, and the court was called upon to decide whether the evidence was sufficient to sustain the findings of fact, and, if it was, whether the facts as found would support the judgment. In short, the Supreme Court of the Territory was called upon to determine whether, according to the justice of the case as shown by the record, the judgment of the District Court was right.

The act of April 7, 1874 (supra), provides that on appeals to this court from the territorial courts, in cases where there has been no trial by jury, instead of the evidence at large, a statement of the facts of the case in the nature of a special verdict, and also the rulings of the court on the admission or rejection of evidence when excepted to, shall be made and certified by the court below, and transmitted to this court with the transcript of the proceedings and judgment or decree. Under this act, if the findings of the District Court are sustained by

the Supreme Court, and a general judgment of affirmance rendered, the findings of the District Court, thus approved by the Supreme Court, will furnish a sufficient "statement of the facts of the case" for the purposes of an appeal to this court. The same will be true if there is a reversal, for the reason that the facts as found are not sufficient to support the judgment. But if, as in this case, the judgment is reversed because the evidence does not sustain the findings, other findings must be made before the case can be put in a condition for hearing in this court on appeal. Without undertaking to decide what would be the proper practice in an ordinary civil action when a judgment is reversed because a new trial was refused in the District Court, we are clearly of the opinion that in a suit like this, where all the evidence is before the Supreme Court that could be considered by the District Court if the case should be sent back, it is proper for the Supreme Court itself to state the facts established by the evidence and render the judgment which ought to have been rendered by the District Court. To remand the case for a new trial would be in substance only to direct the District Court to state the facts as found by the Supreme Court and adjudge accordingly. This would make another appeal to the Supreme Court necessary in order to put the case in a situation for a review in this court, the probabilities being that on such an appeal the Supreme Court would be called upon to do no more than affirm its former judgment. There is no statute of the Territory which in express terms creates the necessity for such a circuity of action, and we do not think the Practice Act, when fairly interpreted, requires it. Upon a new trial no new testimony could be introduced. The District Court could do no more than find the facts which, in the opinion of the Supreme Court, should have been found before, and the judgment which should follow from those facts may just as well be settled by the Supreme Court on the first appeal as on a second. We conclude, therefore, that the case is properly here for decision upon the facts stated by the Supreme Court, and this brings us to the inquiry whether, upon these facts, the judgment appealed from was right.

The act of March· 2, 1867 (*supra*), provides that the "land so settled and occupied" for a town site may be entered at the

land-office, " in trust for the several use and benefit of the occupants thereof according to their respective interests," and that the execution of the trust shall " be conducted under such rules and regulations as may be prescribed by the legislative authority of the State or Territory." The legislature of Utah enacted that the lands so acquired in trust should be conveyed to the " rightful owner of possession, occupant, or occupants," or to such persons as might be entitled to the occupancy or possession. Comp. Laws, 381.

In *Cofield* v. *McClelland* (16 Wall. 331), this court decided that the act of Congress created the trust in favor of those who at the time the entry was made were occupants, or entitled to the occupancy.

In *Hussey* v. *Smith* (*supra*, p. 20), we held that a non-resident might, by purchase from an occupant, acquire such a right to the occupancy as would entitle him to 'a judgment for a conveyance under the trust. The power of an occupant to sell and convey his possessory rights is clearly recognized by the territorial statute.

It is expressly found that the appellees were not in the actual possession of any part of the lot, except that which was adjudged to them by the District Court, when the entry was made by the corporate authorities. Joseph Cain died in 1857, leaving his widow, Elizabeth Cain, and two minor children, Elizabeth, now Mrs. Crimson, aged nine years, and Joseph M., aged seven. He then occupied the whole of the east half of the lot in question as his homestead. Soon after his death, Brigham Young set up a claim to the north half of the premises, and the widow, without recognizing his right, submitted to his demand. Young afterwards assumed to control the property, and transferred a part of it by deed to Jennings, who went into possession, claiming the right of occupancy, and under his occupation improvements were made by himself or his tenants. Young was never himself an actual occupant, but it is found that when the testimony was taken the Co-operative Company was in possession, paying him rent. It does not, however, distinctly appear from the findings whether either Jennings or the company were occupying the property when the entry was made at the land-office.

At some time after the death of Cain, his widow sold and conveyed to Charles King all " her right of claim, interest, and possession " in that part of the south half of the premises in controversy which was claimed by Jennings and adjudged by the District Court to him. When the testimony was taken in the case, the Co-operative Mercantile Company was in actual possession of this part of the lot, paying rent to Jennings. It is not stated definitely when this conveyance was made by Mrs. Cain or when the tenants of Jennings went into possession, though it is found that Jennings himself was never an actual occupant of the property.

On the 10th of December, 1869, the Stringfellow Brothers went into the possession of that part of the premises claimed by them, under a sale made by the administrators of Cain to pay taxes assessed upon the property after his death, and to pay debts incurred for improvements also made after his death. They paid for the property its full market value at the time, and were in the actual occupation when the entry was made by the corporate authorities at the land-office. The children of Cain were not made parties to the proceedings in the Probate Court to obtain an order for the sale, but from the time the sale was made until the statements were filed in the office of the clerk of the Probate Court, neither they nor their mother had possession of the premises which were sold.

Upon this state of facts it is apparent that the real question to be settled is whether the children of Cain retain the benefit of their father's occupancy of that part of the lot in controversy not in their actual possession when the town site was entered at the land-office by the corporate authorities. All the interest their father had in the lot when he died was an inchoate right to the benefit of the town-site law in case the property should be purchased from the United States by the corporate authorities under the provisions of that law. All he could do was to maintain his occupancy, and claim the statutory trust in his favor in case that trust should be created. He held the position of one seeking to acquire a title by a possession adverse to all the other inhabitants of the town. His right to maintain this adverse possession descended under the laws of Utah to his widow and children. There can be no doubt that the possession

the children thus acquired, if continued, would have ripened into a perfect title under the trust.

The infants could not bind themselves by contract to sell and convey their possessory rights, but they might lose their rights by a failure to keep possession. They need not maintain an actual occupancy, but they must in some form retain control of the property to the exclusion of an adverse entry. When Cain died, the mother became the head of the family and by the laws of Utah the natural guardian of the children. In this way she had by law the control of their persons. If she remained in the possession of the property she necessarily did so for the benefit of her children and herself in proportion to their respective interests in the inheritance; but if she voluntarily withdrew from the property and gave it up to others, the rights of the children as well as herself, which depended upon keeping the possession. were gone. The adverse possession commenced by the father might. in this way be abandoned.

Applying these principles to the facts as stated we think it clear that the rights which the children had as occupants on their father's death were given up by their mother, except as to that part of the lot they had in actual possession when the corporate authorities purchased the land from the government. Soon after the death of the father the mother yielded up the possession of the north half of the lot on the demand of Mr. Young, the leader of the Mormon Church, to which she and her husband during his life belonged. It matters not for the purposes of this inquiry whether this was rightfully or wrongfully done. In point of fact it was done many years before the purchase from the government. After that Young assumed the control of the property so surrendered and deeded some part of it away. Subsequently the mother sold and conveyed to King that part of the south half which is now claimed by Jennings. From the facts as stated it may fairly be presumed that this was done to save or improve the remainder. Her husband when he died owed no debts, and so far as appears had no considerable amount of property except his possessory rights in this lot. To raise the means to pay taxes which accrued after his death, and to pay debts incurred for improve-

ments also made after his death, his administrators sold that part of the south half now claimed by the Stringfellows, and received its full value in money. When these several sales were made the mother withdrew with her children from the occupancy, and the Stringfellows made an actual entry in December, 1869, which they have kept up until the present time. If the mother was not technically the guardian in socage of the children, she occupied under the circumstances the place of such a guardian, and Mrs. Crimson, who was then unmarried, must have been of full age when the Stringfellows took their possession. We cannot see how there could be an abandonment if this is not, and it seems clear to our minds that it must have been made by the mother in an honest effort on her part to save all she could of that which the father by his original occupancy had endeavored to secure.

We are, therefore, of the opinion, from the facts as they are stated by the Supreme Court : —

1. That the surrender of the north half of the lot by Mrs. Cain on the demand of Young was such an abandonment of the possession as deprived her and her children of the right to claim title to that part of the lot without a subsequent entry, which is not shown.

2. That the conveyance by Mrs. Cain to King operated in the same way in respect to that part of the south half of the lot embraced in her deed to him.

3. That the administrator's sale had the same effect as to that part of the lot bought by George and Samuel Stringfellow, or one of them.

4. That George and Samuel Stringfellow are entitled to a conveyance of that part of the lot described in the administrator's deed, and claimed by them in their statement filed with the clerk of the Probate Court.

5. That the appellees are entitled to a conveyance of all that part of the south half of the premises not embraced in the deed of Mrs. Cain to King and in that of the administrators to Stringfellow, and no more.

The judgment of the Supreme Court of the Territory will therefore be reversed, and the cause remanded with instructions :

1. To enter or cause to be entered in the proper court a judg-

ment in favor of George Stringfellow and Samuel Stringfellow for that part of the lot purchased by them at the administrator's sale. 2. To enter or cause to be entered a judgment in favor of the appellees, according to their respective interests under their inheritance from Joseph Cain, for that part of the south half of the premises in controversy not sold to Stringfellows and King, and dismissing their claim as to all the rest and residue of the lot. 3. To rehear the case upon the evidence sent up from the District Court in respect to the claims of Jennings and Young as against the corporate authorities of Salt Lake City, and decide according to the justice of the case.

The appellees will pay the costs of this appeal.

*Judgment reversed.*

MR. JUSTICE STRONG and MR. JUSTICE BRADLEY did not sit in this case nor take any part in deciding it.